# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| BARBARA J. GOOD, ) | |
| ) | |
| Plaintiff, ) | No. 09 C 4802 |
| ) | |
| v. ) | Judge Ronald A. Guzmán |
| ) | |
| THE UNIVERSITY OF CHICAGO ) | |
| MEDICAL CENTER, an Illinois ) | |
| mot-for-profit corporation, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff has sued defendant for reverse race discrimination pursuant to Title VII, 42 U.S.C. § 2000e, and 42 U.S.C. § 1981. The case is before the Court on defendant's Federal Rule of Civil Procedure ("Rule") 56 motion for summary judgment. For the reasons set forth below, the Court grants the motion.

## Facts

Defendant's Radiology Department has four components, the Computerized Tomography Department ("CT"), the Magnetic Resonance Imaging ("MRI") Department, the Ultrasound Department and the Nuclear Medicine/Positron Emission Technology ("PET") Department, each of which has a manager. (Pl.'s Resp. Def.'s LR 56.1(a) Stmt. ¶¶ 5-6.) Each of the components assigns staff technologists, who do the imaging, to one of three daily shifts, and designates a lead technologist, also called an Imaging Team Leader, for each shift. (*Id.* ¶¶ 7-8, 11.) All staff and lead technologists are bi-weekly employees. (*See id.* ¶ 10; Def.'s LR 56.1(a) Stmt. ¶ 10.) All managers,

also called Imaging Center Leaders, are monthly, managerial employees. (Pl.'s Resp. Def.'s LR 56.1(a) Stmt. ¶¶ 12-13.)

Each year, the managers review the bi-weekly employees' performance and assign each an overall rating from 1 ("Needs Improvement. Consistently performs below job requirements" ) to 5 ("Role Model. Provides an example to which other Hospital employees can aspire.") (*See id.* ¶ 27; Def.'s LR 56.1(a) Stmt. ¶ 27; *id.*, Ex. E, Good Dep. Ex. 1, Good Performance Review of June 23, 2007.) It is defendant's policy to put any bi-weekly employee whose overall rating is less than 3 on a performance improvement plan ("PIP"). (*See* Pl.'s Resp. Def.'s LR 56.1(a) Stmt. ¶ 29; Def.'s LR 56.1(a) Stmt. ¶ 29; *id.*, Ex. F, Austin Dep. Ex. 16, Best Practices Managing Low Performing Employee at 12.)

Bi-weekly employees are also subject to defendant's four-step Progressive Corrective Action Policy and an employee's "failure to meet conditions of corrective action," which includes failing to complete a PIP, is grounds for termination. (*See* Def.'s LR 56.1(a) Stmt., Ex. C, Austin Decl. Ex. 2, Univ. Chi. Med. Ctr. Policy & Proc. Manual, Employee Termination at 2; *id.*, Ex. 3, Univ. Chi. Hosps. Personnel Policy Guidelines, Progressive Corrective Action at 1.) Monthly employees are not subject to this policy. (*See id.*, Ex. 3, Univ. Chi. Hosps. Personnel Policy Guidelines, Progressive Corrective Action at 2.) Rather, "[t]heir performance problems [are] dealt with on a case by case basis." (*Id.*)

According to defendant's Policy and Procedure Manual, "it is the policy of the University of Chicago Hospitals to demote [an] individual[]" who "cannot perform . . . her assigned job responsibilities" because "her skills are not matched to the requirements of the job" or she "lack[s] . . . motivation to perform up to standards." (Pl.'s Resp. Def.'s LR 56.1(a) Stmt., Ex. 11, Univ. Chi. Med. Ctr. Policy & Proc. Manual, Personnel Policy Guidelines, Demotion at 1.)

In 1994, defendant hired plaintiff as lead technologist in the CT Department. (Pl.'s Resp. Def.'s LR 56.1(a) Stmt. ¶ 17.) In 1999, plaintiff resigned for a brief period of time but was re-hired by defendant as a CT staff technologist later that year. (*Id.* ¶¶ 18-19.)

In 2004, defendant promoted her to lead technologist. (*Id.* ¶ 20.) From 2005 through the end of her employment, plaintiff's supervisor was CT Manager Cliff Sissel, who is white. (*Id.* ¶¶ 22-23.) Sissel's supervisor was Monica Geyer, the Assistant Director of Specialty Imaging Services, who is white. (*Id.*)

Sissel reviewed Good's performance for the period July 1, 2006 through June 30, 2007 and gave her an overall rating of 2.65 out of 5. (*Id.* ¶ 24.) He noted that:

> Managing the workflow and patient schedule are areas that need improvement. . . . She needs to keep her staff informed of expectations/changes in the department . . . . [and] openly support the goals of the department and the organization at all times.
>
> . . . .
>
> [Barbara] needs to remain a positive influence in the department and eliminate negative comments around her staff. Barbara has been counseled in the past about changing this behavior and has made attempts to improve that have not been sustained. . . .
>
> . . . .
>
> Barbara has the ability to be a successful team leader. . . . Things that are holding Barbara back are the communication she has with her shift, fair work distribution, and controlling the schedule.

(Def.'s LR 56.1(a) Stmt., Ex. E, Sissel Dep. Ex. 1, Good Performance Review of June 23, 2007 at 2-4.)

Because plaintiff's rating was below 3, on July 11, 2007, Sissel and Geyer gave her a ninety-day PIP. (Pls.' Resp. Def.'s LR 56.1(a) Stmt. ¶¶ 35-38.) The PIP states that plaintiff is expected to: (1) "Ensure [that] requisitions are reviewed and processed . . . . [–] time stamped, floor notified, any

3

prep sent within a timely fashion and transportation is pre-scheduled for timely service"; (2) "Continue to make advancements on the CT department's goal for all staff to reach 1.5 procedures per hour"; (3) "Ensure [that] distribution of work is even and fair for all staff member [sic] on 2nd shift"; and (4) "Ensure overtime is keep [sic] to a minimum and is approved through the manager." (*Id.* ¶¶ 37-38; Def.'s LR 56.1(a) Stmt., Ex. D, Geyer Dep. Ex. 14, PIP of July 11, 2007.)

When she received the PIP, plaintiff told Sissel and Geyer that she "would be . . . happy to step down to a staff tech position." (Pl.'s Resp. Def.'s LR 56.1(a) Stmt., Ex. 4, Good Dep. at 119-20.) Geyer responded: "[T]hat's a possibility. We might think about that." (*Id.* at 120.)

Over the next few months, Sissel met with plaintiff a number of times to discuss performance issues, and on October 9, 2007, he told her that she had not successfully completed the ninety-day PIP. (Pl.'s Resp. Def.'s LR 56.1(a) Stmt. ¶¶ 41-46.) Plaintiff again asked if she "could step down to a staff tech position." (*Id.*, Ex. 4, Good Dep. at 144-45.) Geyer said: "[W]e're thinking about it." (*Id.* at 145.)

On October 12, 2007, Geyer gave plaintiff a final written warning, moved her to the third shift and put her on a thirty-day PIP because she had failed to meet "the majority of the [ninety-day PIP] goals impacting patient care" and "multiple staff members" were so unhappy with her leadership that they had asked to be moved to another shift. (Def.'s LR 56.1(a) Stmt., Ex. D, Geyer Dep. Ex. 28, Corrective Action Form of Oct. 12, 2007.)

In late October or early November 2007, plaintiff again asked Sissel and Geyer to give her a demotion. (Pl.'s LR 56.1 Stmt. Add'l Facts ¶ 10.) Plaintiff says Geyer told her defendant "had changed [its] policies" and "had decided not to do that anymore." (*Id.*)

On November 27, 2007, defendant terminated plaintiff's employment. (Pl.'s Resp. Def.'s LR 56.1(a) Stmt. ¶ 56.)

4

**Discussion**

To prevail on a summary judgment motion, the movant must show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). At this stage, we do not weigh evidence or determine the truth of the matters asserted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). We view all evidence and draw all inferences in favor of the non-moving party. *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000). Summary judgment is appropriate only when the record as a whole establishes that no reasonable jury could find for the non-moving party. *Id.*

Plaintiff can defeat defendant's motion on her Title VII and § 1981 claims by using the direct method, *i.e.*, offering evidence of actions or comments that suggest bias, show that defendant gave "systematically better treatment" to similarly situated, non-white employees or treated non-white employees more favorably for incredible reasons, or the indirect method set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 719-21 (7th Cir. 2005) (quotation omitted); *see Bratton v. Roadway Package Sys., Inc.*, 77 F.3d 168, 176 (7th Cir. 1996) ("We analyze § 1981 discrimination claims in the same manner as claims brought pursuant to Title VII . . . .").

Plaintiff contends that her claims survive under the direct method because the record shows that defendant routinely demoted similarly situated, non-white employees instead of terminating them. Defendant admits that it demoted non-white Radiology Department employees Kenneth Cooks, Loretta Durr McNair, Jesse Castenada and Joann Balderos-Mason but argues that they are not comparable to plaintiff. (Pl.'s Resp. Def.'s LR 56.1(a) Stmt. ¶¶ 59-65); *see Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002) (stating that employees are similarly situated if they are "directly comparable" in all respects material to the employment decision, *e.g.*, they have

the same supervisor, are subject to the same employment standards and have comparable qualifications and experience).

The record shows that: (1) Cooks, Durr McNair and Castenada were demoted from monthly, manager positions, not bi-weekly technologist positions like plaintiff; (2) Cooks, Durr McNair and Castenada were not subject to the Progressive Action Policy pursuant to which plaintiff was terminated; and (3) Sissel and Geyer, who were the driving force behind plaintiff's termination, had little or no input into the decisions to demote Cooks, Durr McNair and Castenada. (Pl.'s Resp. Def.'s LR 56.1(a) Stmt. ¶¶ 10, 59-60, 62-64, 67; *id.*, Ex. 3, Austin Dep. at 138; *id.*, Ex. 14, Letter to Geyer from Castenada of Jan. 17, 2008; Def.'s LR 56.1(a) Stmt., Ex. C, Austin Decl. ¶¶ 5-7; *id.*, Ex. 3, Univ. Chi. Hosps. Personnel Policy Guidelines, Progressive Corrective Action.) Plaintiff does not dispute these facts but says they are irrelevant. In her view, any employee who was subject to the demotion policy, as Cooks, Durr McNair and Castenada undisputedly were, is comparable to her.

That might be true if the policy gave every employee an unqualified right to be demoted. But there is no dispute that it does not and must "be read in conjunction with [defendant's] other policies." (Def.'s LR 56.1(a) Stmt., Ex. F, Austin Dep. at 139; Pl.'s Resp. Def.'s LR 56.1(a) Stmt. ¶ 69.) Defendant's other policies include holding monthly employees like Cooks, Durr McNair and Castenada "to a higher standard of performance" than bi-weekly employees, exempting them from the Progressive Corrective Action Policy and dealing with "their performance problems . . . on a case by case basis." (Def.'s LR 56.1(a) Stmt., Ex. C, Austin Decl. Ex. 3, Univ. Chi. Hosps. Personnel Policy Guidelines, Progressive Corrective Action at 1-2.) Given the discretion inherent in applying the demotion policy, particularly to monthly employees, the simple fact that Cooks, Durr McNair and Castenada were subject to the demotion policy does not make them comparable to plaintiff.

6

Viewed favorably to plaintiff, however, the record suggests that Balderos-Mason is comparable. Like plaintiff, Balderos-Mason was demoted from a lead technician position to a staff technician position, and Geyer was involved in the decision to demote her. (Pl.'s Resp. LR 56.1(a) ¶¶ 59-60, 65; *see id.*, Ex. 9, Email to Balderos-Mason, Sauers & Geyer from Smith of July 3, 2006 & Email to Smith, Sauers & Geyer from Balderos-Mason of July 3, 2006; *id.*, Ex. 13, Balderos-Mason Performance Review of June 29, 2006.) Moreover, the performance reviews that prompted defendant to take action against the two women have similar or identical ratings in a number of categories and both cite attitude as a performance problem. (*Compare* Pl.'s Resp. Def.'s LR 56.1(a) Stmt., Ex. 13, Balderos-Mason Performance Review of June 29, 2006, *with* Def.'s LR 56.1(a) Stmt., Ex. D, Geyer Dep. Ex. 1, Good Performance Review of June 23, 2007.) Balderos-Mason was demoted a year before plaintiff was terminated and, unlike plaintiff, was not on a PIP before she was demoted. (Pl.'s Resp. Def.'s LR 56.1(a) Stmt. ¶ 65; *id.*, Ex. 9, Email to Balderos-Mason, Sauers & Geyer from Smith of July 3, 2006 & Email to Smith, Sauers & Geyer from Balderos-Mason of July 3, 2006.) But the evidence suggests that the same demotion policy applied to both women and that Balderos-Mason took the demotion precisely to avoid the PIP fate. (*Id.*, Ex. 3, Austin Dep. at 37-43.) In short, for purposes of this motion, plaintiff has shown that Balderos-Mason is a comparable non-white employee who received more favorable treatment.

The sole fact that defendant demoted one comparable non-white employee cannot reasonably "be interpreted as an acknowledgment [by defendant that it terminated plaintiff with] discriminatory intent," *i.e.*, direct method proof. *See Rudin*, 420 F.3d at 720 (quotation omitted). Plaintiff contends, however, that that interpretation becomes reasonable when the demotion is viewed along with the circumstances surrounding her termination, including that: (1) defendant's reasons for terminating her changed over time; (2) defendant changed plaintiff's shift, not her job assignment, during the

7

thirty-day PIP; and (3) Geyer told her demotion was not an option because defendant had changed its policies.

The Court disagrees. Though defendant did not use identical language to describe plaintiff's performance problems in her review and PIPs, the record shows that the substance of its critique remained the same. The performance review states:

> Things that are holding [plaintiff] back are the communication she has with her shift, fair work distribution and controlling the schedule. . . . [She] also needs to work on pre-scheduling transports and coordinating exams with nursing units to minimize delays. This also means communicating in advance to the staff about what is pending and when it is expected to be in route to the department. Staying positive and keeping staff informed will help her improve in her role.

(Def.'s LR 56.1(a) Stmt., Ex. D, Geyer Dep. Ex. 1, Good Performance Review of June 23, 2007 at 4.) The ninety-day PIP does not explicitly mention plaintiff's communication skills, but instructs her to ensure that work is evenly distributed, test preparation and paperwork is done timely, patients are scanned promptly and overtime is reduced, all of which imply that her communication with the staff is sub-par. (*Id.*, Geyer Dep. Ex. 14, PIP of July 11, 2007.) The thirty-day PIP reiterates the expectations set forth in the ninety-day PIP. (*Id.*, Ex. E, Sissel Dep. Ex. 45, PIP of Oct. 9, 2007; *see id.*, Ex. D, Geyer Dep. Ex. 28, Final Written Warning of October 12, 2007.) Finally, in the email she sent to Human Resources in November 2007 recommending that plaintiff be terminated, Geyer said:

> 1. Staff want to be transferred off of [plaintiff's] shift.
> 2. [She] does not communicate well with the staff.
> 3. [She] gets short tempered with the staff when they remind her of things that need to be done.
> 4. [She] does not provide direction and does not assist the staff in ensuring smooth workflow.
> 5. [She] does not provide the staff with complete sets of paperwork prior to patient arrival, which delays patient care.
> 6. . . . [She] demonstrates no sense of urgency in getting the patients completed in a timely manner.
> 7. There is no sense of team between [her] and the technologists.
> 8. [She] is not providing training to the new technologist on the shift.

8

(*Id.*, Geyer Dep. Ex. 31, Email to Slaviero from Geyer of Nov. 12, 2007.) In short, the evidence shows that the substance of defendant's criticism of plaintiff stayed the same from the time of her performance review in June 2007, through the end of her employment. Thus, the fact that the words defendant used to convey it differs somewhat from document to document does not suggest that the criticism was baseless.

The record shows that defendant's transfer of plaintiff from the second to the third shift is equally innocuous. It is undisputed that: (1) the demotion policy did not entitle plaintiff to a demotion; (2) the third shift is less busy than the second; and (3) defendant changed plaintiff's shift rather than terminating her after she failed the ninety-day PIP. (*Id.*, Geyer Dep. at 102; Pl.'s Resp. Def.'s LR 56.1(a) Stmt. ¶¶ 53, 69.) Given this uncontroverted evidence, no inference of wrongdoing arises from the shift change.

That leaves Geyer's misstatement – a lie, viewed favorably to plaintiff – about the demise of the demotion policy. Even coupled with Balderos-Mason's 2006 demotion, however, this statement is not enough to satisfy the direct method of proof given that: (1) defendant replaced plaintiff with a white employee; (2) plaintiff experienced no other alleged race discrimination during her tenure with defendant; (3) in late 2006, defendant demoted Christian Beezhold, who is white, from the position of Adult Ultrasound Manager to a technologist position, just as it had his non-white counterparts Cooks, Durr McNair and Castenada; and (4) plaintiff offers no evidence that suggests defendant discriminated against any other white employee. (*See* Pl.'s Resp. Def.'s LR 56.1(a) Stmt. ¶¶ 17-20, 56-57, 73.)

These undisputed facts and omissions also doom plaintiff's attempt to show intent under the *McDonnell Douglas* indirect method of proof. That method requires plaintiff to make a prima facie case of reverse discrimination by showing, among other things, that there are "background

9

circumstances sufficient to demonstrate that [defendant] has reason or inclination to discriminate invidiously against whites or evidence that there is something 'fishy' about the facts at hand." *Ineichen v. Ameritech*, 410 F.3d 956, 959 (7th Cir. 2005) (quotation omitted). As noted above, there is no such evidence. Thus, plaintiff's claims fail under the indirect method as well.

## Conclusion

For the reasons set forth above, the Court finds that there is no genuine issue of material fact as to plaintiff's claims against defendant, which is entitled to judgment as a matter of law on them. Therefore, the Court grants defendant's motion for summary judgment [doc. no. 23] and terminates this case.

**SO ORDERED.**   **ENTERED:**

**June 23, 2011**   _____
  **HON. RONALD A. GUZMAN**
  **United States District Judge**